## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| CARTRELL D. ESPER, | ) | CASE NO. 3:20-CV-02775-JRK |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES R. KNEPP II |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY, | ) | JENNIFER DOWDELL |
| | ) | ARMSTRONG |
| Defendant. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.     INTRODUCTION

Plaintiff Cartrell D. Esper ("Esper") seeks judicial review of the final decision of the Commissioner of Social Security denying his application for a period of Supplemental Security Income ("SSI"). This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). (*See* ECF non-document entry dated 09/02/2022). For the reasons set forth below, the undersigned RECOMMENDS that the Court OVERRULE Esper's assignment of error and AFFIRM the Commissioner's decision.

## II.     PROCEDURAL HISTORY

On August 9, 2018, Esper filed an application for a period of SSI, alleging a disability onset date of August 1, 2012. (ECF Doc. No. 14, Exhibit 1D, PageID # 330). The application was denied initially on September 27, 2018 (ECF Doc. No. 14, Exhibit 1B, PageID # 200), and upon reconsideration on December 12, 2018 (ECF Doc. No. 14, Exhibit 3B, PageID # 206). Esper requested a hearing before an administrative law judge ("ALJ"), which – at Esper's request – was continued until February 28, 2020, so that Esper could retain counsel. (*See* ECF Doc. No. 14, PageID # 158-73; 121-57).

At the hearing, Esper, represented by counsel, and an impartial vocational expert ("VE") testified. (*See id.* at PageID # 121-57). On April 1, 2020, the ALJ issued a written decision finding Esper was not disabled. (*Id.* at PageID # 97-115). The ALJ's decision became final on October 29, 2020, when the Appeals Council declined further review. (*Id.* at PageID # 83-85).

On December 16, 2020, Esper filed his Complaint to challenge the Commissioner's final decision. (ECF Doc. No. 1). The parties have completed briefing in this case. (ECF Doc. Nos. 16, 19, 21, and 22). Esper asserts the following assignment of error:

> The ALJ's Step Two and Step Three conclusions are not supported by substantial evidence as they fail to properly evaluate and summarize evidence of significant cognitive and intellectual impairments.

(ECF Doc. No. 16, PageID # 1289).

## III.     BACKGROUND

### A.     Personal, Educational, and Vocational Experience

Esper was born on February 1, 1975, and he was 34 years old on the alleged onset date. (ECF Doc. No. 14, PageID # 130; *see* ECF Doc. No. 14, Exhibit 1D, PageID # 330). Esper has five children, is single, has a history of drug abuse, and – at the time of the hearing before the ALJ – was ten-months sober and living at Recovery House, which is affiliated with the Zepf Center. (ECF Doc. No. 14, PageID # 131, 138). Esper completed "maybe the eighth grade," and he has not obtained a GED or received vocational training. (*Id.* at PageID # 133). Esper mowed lawns and weed-whacked for about one and one-half months in 2019, but he stopped working because his arthritic hand was bothering him, he got frustrated with other people, and his anxiety "kept kicking in[.]" (*Id.* at PageID # 134-36). Aside from that work, Esper previously worked ten hours per week, earning fifteen dollars per week, folding clothes at the Salvation Army while he was previously residing there, which was a condition of his stay. (*Id.* at PageID # 133-34).

**B.  Relevant Hearing Testimony**

**1.  *Esper's Testimony***

Esper testified that he has a history of drug abuse, that he previously used marijuana and cocaine to self-medicate, and that he had been sober for ten months at the time of the hearing. (ECF Doc. No. 14, PageID #138). Esper testified that, from May 26, 2019 until June 19, 2019, he was hospitalized because he was suicidal. (*Id.* at PageID # 138-39). Esper testified that he went directly to Recovery House after leaving the hospital, and that he had been in counseling for the past four and one-half months. (*Id.* at PageID # 137-38, 149). Esper testified that he does not like being around a lot of people, so he mostly stays to himself. (*Id.* at PageID # 144). Esper testified that he attends sobriety meetings, watches the news, uses coloring books, and makes phone calls on his cell phone. (*Id.* at PageID # 144-45).

Esper testified that he can: (1) shower and dress himself; (2) prepare simple meals; (3) clean up after himself; and (4) operate laundry machines, if someone shows him how. (*Id.* at PageID # 142, 145-46). Esper testified that he does not read or write well, and that he can only write his name. (*Id.* at PageID # 132). Esper testified that he can read a simple grocery list, and he can also read the sticky notes that the Recovery House staff leave for him to remind him what he is supposed to do that day. (*Id.* at PageID # 132, 143). Esper testified that he can walk up to three miles at a time, can sit for up to one hour, can lift one gallon of milk with his left (*i.e.*, non-arthritic) hand, and that his current chore at Recovery House is mopping floors. (*Id.* at PageID # 140-41, 146).

Esper testified that he is unable to work because he hears voices, has anxiety attacks, his arthritis bothers him, and he is not a people person. (*Id.* at PageID # 136). Esper clarified that he hears voices mostly at night, is pretty much "okay" during the day, and that his medications are helpful. (*Id.* at PageID #136-37). Esper testified that he has trouble with his memory, which is why

3

the Recovery House staff leave him sticky notes to remind him what he is supposed to do each day. (*Id.* at PageID # 143).

### 2.    *Vocational Expert's Testimony*

The VE testified that Esper could not return to his past work as a landscape specialist. (ECF Doc. No. 14, PageID # 151, 154). The VE testified that Esper could, however, perform work such as a fast-food worker, a motel or hotel housekeeper, or a mailroom clerk. (*Id.* at PageID # 153-54).

### C.    **Relevant Evidence**

The discussion of relevant evidence is not intended to be exhaustive. It includes only those portions of the record cited by the parties in their briefs and/or deemed relevant by the undersigned.

### 1.    *School-Based Testing – February 3, 1994*

In 1994, when Esper was sixteen years old, a school psychologist administered Esper the Weshcler Intelligence Scale for Children-III Test ("WISC-III") and the Weschler Individual Achievement Test ("WIAT"). (*See* ECF Doc. No. 14, Exhibit 12F, PageID # 1252-54). The WISC-III results indicated that Esper was "mildly impaired[,]" but that "his potential is higher than current functioning level indicates." (*Id.* at PageID # 1252). The WISC-III results also indicated that Esper had a full-scale IQ of 69, and that his "general ability level or effective level of functioning falls within the Borderline-Low Average range, based on Full Scale Composite." (*Id.* at PageID # 1251). The WIAT results indicated that Esper had a first-grade equivalent in basic reading, a fourth-grade equivalent in mathematics reasoning, a second-grade equivalent in spelling, and a fifth-grade equivalent in numerical operations. (*Id.* at PageID # 1252).

### 2.    *Central Access Rescue Mental Health Services – July 12, 2018*

Esper presented at Central Access Rescue Mental Health Services on July 12, 2018, with a chief complaint of anxiety. (ECF Doc. No. 14, Exhibit 2F, PageID # 900-01). Esper reported

4

that he had been released from jail that day related to a theft offense, and that he had a history of depression, anxiety, sleep disturbances, panic attacks, and hearing voices. (*Id.*). Esper reported that his depression did not "really bother him[,]" and that he was happy because he just got out of jail. (*Id.* at PageID # 901). The clinician noted, in part, that Esper was oriented, had linear and organized thought processes, and an average intellect. (*Id.*) Esper received prescriptions for Trazadone, Seroquel, and Celexa. (*Id.* at PageID # 903).

### 3.  *Adult Function Report – August 26, 2018*

Esper completed an Adult Function Report on August 26, 2018. (ECF Doc. No. 14, Exhibit 5E, PageID # 378-86). In it, Esper indicated that he has mood fluctuations, that he is unable to read and write, and that his medications "slow [him] down and make it hard for [him] to focus." (*Id.* at PageID # 379). Esper also indicated that he: (1) needs daily reminders to take his medication (*id.* at PageID # 381); (2) can cook basic meals for himself, but it takes him more time because it is hard to focus (*id.*); (3) can do laundry, "mowing," and cleaning, but he needs reminders (*id.*); (4) does not drive because he is "not a good driver" (*id.* at PageID # 382); (5) is not good with managing money or finances (*id.*); (6) can shop for clothes, food, and household items, but does not shop often and becomes confused (*id.*); (7) enjoys playing pool and basketball, and watching sports on television (*id.* at PageID # 383); (8) spends time with others (albeit not often), including going out to eat, shooting pool, and talking with friends (*id.*); (9) goes to church twice per week, but sometimes has difficulty interacting with others (*id.*); (10) has anger problems (*id.* at PageID # 384); (11) has difficulty concentrating on what others are saying, which affects his ability to follow instructions (*id.*); (12) can pay attention for a couple of minutes before his concentration wanders (*id.*); (13) is unable to follow written instructions because he is unable to read (*id.*); (14) can sometimes follow written instructions if they are explained a "couple of times" (*id.*); (15) has difficulty getting along with authority figures (*id.* at PageID # 385); (16) has never had "real"

employment (*id.*); (17) can be "somewhat adaptable" (*id.*); (18) gets depressed, has anxiety, and sometimes hears voices (*id.*); and (19) is currently taking Seroquel, which causes him to "slow[] down" (*id.* at PageID # 386).

### 4. *Zepf Center*

Esper presented at the Zepf Center on January 8, 2019, for a re-admission/re-evaluation. (ECF Doc. No. 14, Exhibit 7F, PageID # 978). Esper reported that he: (1) tries not to interact with others; (2) stays to himself; (3) cannot read or write; (4) has a fifth-grade education; (5) suffers from schizophrenia; and (6) gets depressed and anxious. (*Id.*). Esper also reported, among other things, that his medications have been helpful, and that he hopes to return to school for a GED. (*Id.* at PageID # 978-79). During that visit, the clinician noted that Esper's thought process was logical, Esper's perception and cognition were within normal limits, and Esper's estimated intelligence was borderline. (*Id.* at PageID # 981).

Esper presented at the Zepf Center on February 6, 2019, for a medication management follow-up appointment. (ECF Doc. No. 14, Exhibit 7F, PageID # 973). Esper reported that he was still attending sobriety meetings, staying sober, "doing alright[,]" getting along with others at the Salvation Army, eating and sleeping well, and taking his medications as prescribed. (*Id.*). The clinician noted that Esper's thought process was logical, that Esper's perception, cognition, insight, and judgment were within normal limits, and that Esper's estimated intelligence was borderline. (*Id.* at PageID # 975).

Esper presented at the Zepf Center on April 3, 2019, for another medication management follow-up appointment. (ECF Doc. No. 14, Exhibit 7F, PageID # 930). Esper reported that his mood, sleeping, and eating were "alright[,]" and he denied feelings of sadness, anger, and/or confusion. (*Id.*). Esper also denied suicidal thoughts and hallucinations, and he indicated that he felt his medications were beneficial. (*Id.*). Esper reported that he was temporarily living with his

mother, that he was working at the Salvation Army warehouse, and that he was getting along with his family. (*Id.*). The assessment indicated, in part, that Esper was assessed for schizoaffective disorder and generalized anxiety disorder. (*Id.* at PageID # 933). The clinician indicated that Esper's thought process was logical, Esper's perception, cognition, insight, and judgment were within normal limits, and Esper's estimated intelligence was borderline. (*Id.* at PageID # 932).

On June 24, 2019, Esper presented at the Zepf Center following a 21-day stay at St. Charles Hospital for suicidal ideation and substance abuse. (ECF Doc. No. 14, Exhibit 7F, PageID # 950, 954). During that appointment, Esper indicated that he "had a learning disability when he was child so he was in special classes." (*Id.* at PageID # 951). Esper indicated that he "enjoys basketball, fishing, shooting pool, [and] watching movies[.]" (*Id.* at PageID # 952). Esper also indicated that he has a "5th or 6th grade education[,]" and that "he has a hard time with reading and writing." (*Id.* at PageID # 953). Esper indicated that, when he is not on medication, he hears voices and feels depressed. (*Id.* at PageID # 954). Esper reported experiencing daily mood swings, that he has difficulty concentrating, and that he struggles with comprehension. (*Id.*).

Esper presented at the Zepf Center on August 21, 2019, for another medication management follow-up appointment. (ECF Doc. No. 14, Exhibit 7F, PageID # 935). Esper reported that he has been managing his daily routines, that his mood was "alright[,]" and that he hears voices at night. (*Id.*). Esper reported that he was attending sobriety meetings at Recovery House and in the community. (*Id.*). The clinician noted that Esper's thought process was logical, that Esper's perception, cognition, and judgment were within normal limits, that Esper had partial insight, and that Esper's estimated intelligence was average. (*Id.* at PageID # 938).

Esper presented at the Zepf Center on September 18, 2019, for another medication management follow-up appointment. (ECF Doc. No. 14, Exhibit 7F, PageID # 929). Esper reported that he was still residing at Recovery House, sleeping well, "doing alright[,]" and was

"staying clean & sober." (*Id.*). Esper reported that his mood was down at times, that he sometimes felt anxious and irritable, and that he continued to hear voices. (*Id.*). Esper also reported that he was getting along well with others at Recovery House, that his medications were working, and that he was looking forward to spending time with his family. (*Id.*).

Esper completed treatment at Zepf Center on October 16, 2019. (ECF Doc. No. 14, Exhibit 11F, PageID # 1200). Esper's discharge report indicated that Esper had a goal of getting a job, and that Esper indicated that one of his abilities upon discharge was "communicat[ing] well with others." (*Id.* at PageID # 1201, 1204).

### 5.      *Mercy Health – May 26, 2019 through June 19, 2019*

As previously noted, Esper presented at Mercy Health on May 26, 2019, for suicidal ideation, and was discharged in stable condition on June 19, 2019. (ECF Doc. No. 14, Exhibit 8F, PageID # 1000). While at Mercy Health, Esper participated in group and individual therapies. (*Id.* at PageID # 1001). Prior to his discharge, Esper indicated that his depression had  "lifted," his sleep had improved, and he was not having hallucinations or delusions. (*Id.*). Clinician notes from Esper's discharge examination indicate that Esper's mood was euthymic, Esper's thought processes were linear, goal directed, and coherent, Esper's cognition was intact, Esper's memory was age appropriate, and that Esper's insight and judgment were fair. (*Id.* at PageID # 1002). The clinician noted that Esper "displayed a good level of engagement with the treatments offered" while at Mercy Health. (*Id.*).

### 6.      *Consultative Examination – Daniel K. Watkins, Ph.D. – October 9, 2019*

The Ohio Division of Disability Determination ("DDD") referred Esper to Daniel K. Watkins, Ph.D. for a psychological evaluation relating to Esper's disability claim. (ECF Doc. No. 14, Exhibit 10F, PageID # 1187). Dr. Watkins evaluated Esper on October 9, 2019. (*Id.*).

Dr. Watkins noted that Esper has an eighth-grade education, that Esper received special

education services in school for learning problems, and that Esper did not obtain a GED. (*Id.* at PageID # 1188). Dr. Watkins noted that Esper reported living with his stepmother, performing self-care independently, cooking and shopping (albeit limited), playing pool, listening to music, and playing soccer for recreation. (*Id.* at PageID # 1189). Dr. Watkins discussed Esper's behavioral health history, including Esper's treatment for schizophrenia, past drug abuse, and suicidal ideation. (*Id.*). Dr. Watkins noted, in part, that Esper's thought processes and speech were coherent, and Esper did not present as visibly anxious. (*Id.* at PageID #1190). Dr. Watkins indicated that, when evaluating Esper's sensorium and cognitive functioning, Dr. Watkins was "not confident that [Esper] put forth a bona fide effort" in completing the tasks Dr. Watkins asked him to perform. (*Id.* at PageID # 1191).

Regarding Esper's insight and judgment, Dr. Watkins indicated that:

[i]nsight is superficial and limited. Reality testing may at times be impaired. Judgment skills appear to be minimally adequate to allow for participation in a well[-]structured treatment program. Judgment skills may not be completely adequate to allow for fully independent functioning, or for work-related decision-making.

(*Id.* at PageID # 1191-92). Regarding Esper's psychological testing, Dr. Watkins indicated that the "WAIS-IV yielded an FSIQ of 51, falling toward the lower end of the mildly intellectually disabled range." (*Id.* at PageID # 1192). Dr. Watkins indicated, however, that "the test IQ scores . . . appear to reflect an underestimate of [Esper's] actual level of functioning due to questionable effort on [Esper's] part." (*Id.*). Dr. Watkins continued that Esper "may indeed be functioning intellectually in the mildly disabled vs. borderline ranges, but nonetheless appears not to be impaired to the degree suggested by the test scores." (*Id.*).

Dr. Watkins indicated DSM 5 diagnoses of schizoaffective disorder and unspecified trauma and stressor related disorder, as well as drug use disorders that were – according to Esper – in remission. (*Id.*).

Regarding the reliability estimate, Dr. Watkins indicated that Esper's "effort with testing tasks was at times questionable, resulting in IQ test scores of doubtful validity . . . . My best estimate of [Esper's] actual level of intellectual functioning is that it may be low borderline vs. mildly intellectually disabled." (*Id.*). Dr. Watkins concluded that Esper "does appear to be intellectually limited." (*Id.* at PageID # 1193).

Dr. Watkins's report also includes a functional assessment. (*Id.*). Regarding Esper's abilities and limitations in understanding, remembering, and carrying out instructions, Dr. Watkins opined:

> I would expect relatively little difficulty with simple, concrete instructions. Expect more difficulty with complex or abstract instructions. [Esper] may require more repetition or explanation of instructions than would a typical worker.

(*Id.*). Elsewhere in his report, Dr. Watkins indicated that Esper's limitations regarding simple instructions were moderate, and Esper's limitations regarding more complex instructions were marked. (*Id.* at PageID # 1195). Regarding Esper's abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace to perform simple and multistep tasks, Dr. Watkins opined:

> [Esper] appears capable of performing concrete multistep tasks at a moderate pace without undue distractibility, with the caveat that he is likely to do best with rote or repetitive tasks that can be overlearned.

(*Id.* at PageID # 1193). Regarding Esper's abilities and limitations in responding appropriately to supervision and to coworkers in a work setting, Dr. Watkins opined:

> Because of residual anxiety and a history of uninsured hallucinations, sometimes of threatening content, I would expect [Esper] to experience significant limitation coping with supervisors, coworkers, the general public, and typical workplace politics. [Esper] would probably do best in a work situation requiring relatively little interaction with others.

(*Id.*). Regarding Esper's abilities and limitations in responding appropriately to work pressures in a work setting, Dr. Watkins opined that Esper "might be able to cope with a low-pressure work

setting, with the caveat [that he is likely to do best with rote or repetitive tasks that can be overlearned]." (*Id.*). Dr. Watkins also opined that Esper's limitations on his ability to make judgments on simple work-related decisions were marked, and that his limitations on his ability to make judgments on complex work-related decisions were extreme. (*Id.* at PageID # 1195).

## IV.   THE ALJ'S DECISION

The ALJ determined, in part, that Esper: (1) has the following severe impairments: "schizoaffective disorder; major depressive disorder; generalized anxiety disorder; borderline intellectual functioning; alcohol, cocaine, and cannabis use disorder (remission) and, minimal 5th DIP joint degenerative changes of the right hand" (ECF Doc. No. 14, PageID # 100);  (2) does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments (*id.* at PageID # 101); (3) has not been under a disability since August 9, 2018 (*i.e.*, the date Esper filed his application) (*id.* at PageID # 115); and (4) has the residual functional capacity ("RFC") to perform light work (*id.* at PageID # 105).

Regarding Esper's mental impairments, the ALJ explained, in part:

**3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).**

**. . .**

The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04, 12.05, 12.06, and 12.11. In making this finding, the undersigned has considered whether the "paragraph B" criteria ("paragraph A or B" criteria of listing 12.05) are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in one extreme limitation or two marked limitations in a broad area of functioning. An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis. A marked limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.

While the claimant's Wechsler Adult Intelligence Scale - IV scores satisfy the IQ criteria of listing sections 12.05B, the record does not include evidence of deficits

11

of adaptive functioning – a requisite element to meet or equal the listing section. Adaptive functioning refers to how you learn and use conceptual, social, and practical skills in dealing with common life demands. *See* 12.00H. Under 12.05B2, we identify significant deficits in adaptive functioning based on whether there is extreme limitation of one, or marked limitation of two, of the paragraph B criteria (*see* 12.00E; 12.00F). *Id.* In this case, the claimant has not exhibited deficits in adaptive functioning, as he does not have two marked or one extreme limitation of the B criteria, as discussed below.

In understanding, remembering or applying information, the claimant has a moderate limitation. The claimant states that he does not need reminders to take care of personal needs, but he needs reminders to take medication, and to go places. (5E/5, 7). He said that he needs more time to prepare meals because it is hard for h[im] to focus. (5E/5). The claimant said that it is hard for him to concentrate on what others are saying to him, which in turn affects his ability to follow instructions. (5E/8). The claimant said that he can concentrate for a few minutes before his mind wanders. (5E/8). He asserts that he is unable to follow written instructions because he cannot read, but he can sometimes follow spoken instructions if they are explained to him a couple of times. (5E/8). The claimant is able to use a cell phone, but he said he does not use internet. (Testimony). The claimant said people at Zepf help him by making sticky notes for him, and he is able to read the notes. (Testimony). He said he is able to understand the news. (Testimony). During his 2015 mental hospital inpatient stay, the claimant's memory was assessed as intact. (1F/43, 48). In 2018, the claimant's memory was intact. (1F/2; 7F/62, 66, 70). During his 2019 hospitalization, his memory was also assessed as intact. (8F/23, 67). In this domain, the claimant has not more than a moderate limitation.

In interacting with others, the claimant has a moderate limitation. According to the adult function report, the claimant was living with others at the Salvation Army Adult Rehabilitation Center. (5E/3). He is able to shop in stores for clothing, food, and household items. (5E/6). The claimant spends time with others shooting pool, going out to eat, and talking to his friends, though he says he does not do it very often. (5E/7). He goes to church twice a week, but he said it is hard to interact with others sometimes. (5E/7). The claimant said that that he has problems with anger, and he has a lot of trouble getting along with authority figures. (5E/8, 9). When the claimant becomes frustrated because he does not understand the task is supposed to complete, and it affects how he gets along with others. (5E/10). The claimant testified that he is "not a people person," and he does not like being around people and he stays to himself. (Testimony). However, he said he goes to meetings. (Testimony). In February of 2019, the claimant said he had been doing alright and getting along with others at the Salvation Army. He had no episodes of temper outburst or altercation with others. (7F/50). Additionally, the claimant was attending 7-8 meetings weekly, and he saw his sponsor at most meetings. (11F/19). The claimant has not more than a moderate limitation in his ability to interact with others.

With regard to concentrating, persisting or maintaining pace, the claimant has a moderate limitation. The claimant states that his medications affect his ability to

focus. (5E/3). The claimant said he enjoys shooting pool and watching sports on television, and he continues to engage in these activities. (5E/7). The claimant said that it is hard for him to concentrate on what others are saying to him, which in turn affects his ability to follow instructions. (5E/8). The claimant uses coloring books and he watches news. (Testimony). In 2018, the claimant's attention and concentration were intact. (2F/2; 7F/62, 66, 70). The claimant's concentration was poor during his 2019 hospitalization; though later it was assessed as age appropriate. (8F/23, 67). After his 2019 hospitalization, the claimant told his Zepf provider that he was having difficulty concentrating. (7F/31). The record supports the finding that the claimant has not more than a moderate limitation in this domain.

As for adapting or managing oneself, the claimant has experienced a moderate limitation. In his adult function report, the claimant states that stress causes him to be depressed, but he can be somewhat adaptable. (5E/9). The claimant states that when he gets angry [and] he cannot control himself. (5E/9). The claimant was described as cooperative, with good hygiene, and average to good eye contact. (2F/2; 7F/9, 20, 58; 8F/23, 26; 11F/9). The claimant has not more than a moderate limitation in his ability to adapt or manage himself.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria (criteria of listing 12.05) are not satisfied.

(ECF Doc. No. 14, PageID # 101-03). Later in her decision, the ALJ further explained her

Paragraph B conclusions as follows:

[T]here is no evidence claimant has significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the "paragraph B" mental functioning criteria that are identical to the "paragraph B" criteria discussed above. Finally, there is no evidence about the claimant's current intellectual and adaptive functioning and about the history of the claimant's disorder demonstrating or supporting the conclusion that the disorder began prior to the claimant's attainment of age 22.

(*Id.* at PageID # 105).

Regarding Esper's residual functional capacity ("RFC"). The ALJ concluded that:

**4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except he: can never climb ladders, ropes, or scaffolds; can never be exposed to hazards such as moving machinery and unprotected heights; and can never engage in commercial driving. He can frequently handle, finger, and feel with the right upper extremity; and can perform simple, routine, and repetitive tasks, but not at a production rate pace (so, for example, no assembly line work). He can make simple, work-related decisions; and can respond appropriately to occasional interaction with**

> **supervisors, coworkers, and the general public. He can tolerate few changes in the work setting, defined as routine job duties that remain static and are performed in a stable, predictable work environment; any necessary changes need to occur infrequently and be adequately and easily explained. Finally, he requires instructions regarding new tasks to be provided verbally or with a short demonstration rather than in writing and is limited to work which requires only occasional written communication.**

(*Id.* at PageID # 105).

The ALJ explained that she "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 416.929 and SSR 16-3p." (*Id.*). The ALJ also explained that she "considered the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 CFR 416.920c." (*Id.*). The ALJ further explained that:

> In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical or laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.
>
> Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities.

(*Id.* at PageID # 105-06). The ALJ determined that Esper's medically determinable impairments could reasonably be expected to cause some of Esper's alleged symptoms, but that Esper's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (*Id.* at PageID # 107). In reaching this conclusion, the ALJ addressed: (1) Esper's IQ and educational records; (2) Esper's history of drug abuse; (3) Esper's arthritis; (4)

14

Esper's history of schizophrenia, depression, auditory hallucinations (including his improvement with medications and inpatient therapy); (5) Esper's medical records from Central Access Rescue Mental Health Services, Inc.; (6) records from Esper's stay at the Salvation Army; (7) records from the Zepf Center (including Esper's Global Assessment of Function ("GAF") score); (8) records from psychiatrist Dr. Hong; and (9) records from Mercy St. Charles Hospital from May 26, 2019 until June 19, 2019 related to Esper's hospitalization for suicidal ideation, among other records.

Regarding Esper's GAF score of 45, the ALJ found those scores "to be unpersuasive as they have limited probative value in determining [Esper's] actual functional limitations in this matter." (*Id.* at PageID # 111). The ALJ explained:

> As a preliminary matter, GAF scores are ratings of overall psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness intended to plan treatment, measure its impact, and predict outcomes. (DSM-IV, p. 30). They are considered a snapshot of functioning at the time of the examination, but they do not reflect any specific limitations and are not determinative of overall disability. The Commissioner has also stated that GAF scores have no "direct correlation to the severity requirements [of the] mental disorders listings." 65 Fed. Reg. 50746, 50764-65 (2000). Furthermore, the U.S. Court of Appeals for the Sixth Circuit has indicated that even when the records reflect a GAF score of 45-50 (i.e. indicating severe limitations), this would not preclude a claimant from having the mental capacity to hold at least some jobs in the national economy (*Smith v. Comm'r of Soc. Sec.*, 482, F.3d 873, 877 (6th Cir. 2007)). The undersigned has therefore found the GAF scores of record to be unpersuasive as they have limited probative value in determining the claimant's actual functional limitations in this matter. Although the record reflects GAF scores of 45, the undersigned notes the documented scores never varied, even though the timepoints for the scores included days when the claimant felt well, and days soon after the claimant had been discharged from the hospital. The undersigned finds that these scores reflect only a temporary reductions in the claimant's functional abilities and are not indicative of his/her continuing capacity to perform
> basic work functions. (7F/48; 11F/9, 34).

(*Id.*).

Regarding Dr. Watkins, the ALJ determined that portions of his report were not fully persuasive. (*Id.* at PageID # 112). The ALJ explained:

The claimant submitted to a consultative psychological examination on October 9, 2019 performed by Daniel K. Watkins, Ph.D. (10F/6-16). Dr. Watkins noted an administration of the WAIS-IV yielded an FSIQ of 51, falling toward the lower end of the mildly intellectually disabled range. However, the test IQ scores appear to reflect an underestimate of the claimant's actual level of functioning due to questionable effort on his part. The claimant may indeed be functioning intellectually in the mildly intellectually disabled vs. low borderline ranges, but nonetheless appears not be impaired to the degree suggested by the test scores. (10F/11). Dr. Watkins opined diagnoses of schizoaffective disorder, unspecified trauma and stressor related disorder, and cocaine and cannabis use disorder in early full remission per the claimant's report. (10F/11). Dr. Watkins opined th[at] he would expect the claimant to have relatively little difficulty with simple, concrete instructions; and he was likely to do best with rote or repetitive tasks that can be overlearned. Dr. Watkins further opined the claimant would have significant limitation coping with supervisors, coworkers, the general public, and typical workplace politics. He would probably do best in a work situation requiring relatively little interaction with others, and he might be able to cope with a low-pressure work setting. Dr. Watkins's opinion is generally persuasive as the opined functional limitations discussed in his narrative explanation are consistent with the evidence of record showing the claimant has no more than moderate limitations for the same reasons as discussed above in the analysis of the State Agency psychological consultants' opinions. However, Dr. Watkins then goes on to opine moderate to extreme limitations in the claimant's ability to understand, remember, or apply information, and marked limitations in the claimant's ability to interact with the public, supervisors, and coworkers, and his ability to respond appropriately to usual work situations and changed in a routine work setting by checking boxes. (10F/14-16). This portion of Dr. Watkins's opinion is unpersuasive because it is not supported by the record, and inconsistent with the opined limitation found in his narrative explanation.

(*Id.* at PageID # 112).

The ALJ ultimately concluded that, "considering [Esper's] age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of 'not disabled' is therefore appropriate . . . ." (*Id.* at PageID # 115).

## V.    LAW & ANALYSIS

### A.    Standard of Review

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r*

*of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip* at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)

(alteration in original).

### B. Standard for Disability

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.*

### C. Listing 12.05

At Step Three of the sequential evaluation process, a claimant has the burden to show that he has an impairment or combination of impairments that meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant meets all of the criteria of a listed impairment, he is disabled; otherwise, the evaluation proceeds to Step Four. 20 C.F.R. § 404.1520(d)-(e); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also Rabbers v. Comm'r of Soc. Sec. Admin.*, 582 F.3d 647, 653 (6th Cir. 2009) ("A claimant must satisfy all of the criteria to meet

the listing.").

In evaluating whether a claimant meets or equals a listed impairment, an ALJ must "actually evaluate the evidence, compare it to [the relevant listed impairment], and give an explained conclusion, in order to facilitate meaningful judicial review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App. 411, 416 (6th Cir. 2011) (noting that, without such analysis, it is impossible for a reviewing court to determine whether substantial evidence supported the decision). "A claimant must do more than point to evidence on which the ALJ could have based [her] finding to raise a 'substantial question' as to whether he satisfied a listing." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App. 426, 432 (6th Cir. 2014) (quoting *Sheeks v. Comm'r of Soc. Sec. Admin.*, 544 F. App. 639, 641-42 (6th Cir. 2013)). "Rather, the claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing." *Id.* (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)). "Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three." *Id.* at 433; *see also Forrest v. Comm'r of Soc. Sec.*, 591 F. App. 359, 366 (6th Cir. 2014) (finding harmless error when a claimant could not show that he could reasonably meet or equal a listing's criteria).

Listing 12.05 establishes the criteria for intellectual disorder. *See* 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.05. "Listing 12.05 has two paragraphs, designated A and B, that apply to only intellectual disorder. Each paragraph requires that you have significantly subaverage general intellectual functioning; significant deficits in current adaptive functioning; and evidence that demonstrates or supports (is consistent with) the conclusion that your disorder began prior to age 22." *Id.* at § 12.00(A)(3).

To meet Paragraph A under Listing 12.05, the claimant must show:

1. Significantly subaverage general intellectual functioning evident in your cognitive inability to function at a level required to participate in standardized testing of intellectual functioning; and

2. Significant deficits in adaptive functioning currently manifested by your dependence upon others for personal needs (for example, toileting, eating, dressing, or bathing); and

3. The evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22.

*Id.* at § 12.05(A)(1)-(3). Here, the ALJ determined that:

There is no evidence [that Esper] has a significantly subaverage general intellectual functioning evident in [his] cognitive inability to function at a level required to participate in standardized testing of intellectual functioning; and significant deficits in adaptive functioning currently manifested by [his] dependence upon others for personal needs (for example, toileting, eating, dressing, or bathing).

(ECF Doc. No. 14, PageID # 104).

To meet Paragraph B under Listing 12.05, the claimant must show:

1. Significantly subaverage general intellectual functioning evidenced by a or b:

   a. A full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general intelligence; or

   b. A full scale (or comparable) IQ score of 71-75 accompanied by a verbal or performance IQ score (or comparable part score) of 70 or below on an individually administered standardized test of general intelligence; and

2. Significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:

   a. Understand, remember, or apply information (see 12.00E1); or

   b. Interact with others (see 12.00E2); or

   c.  Concentrate, persist, or maintain pace (see 12.00E3); or

   d. Adapt or manage oneself (see 12.00E4); and

3. The evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22.

20 C.F.R. § 404, Subpart P, Appendix 1, § 12.05(B)(1)-(3).

>   Here, the ALJ determined that:

>   In this case, these requirements are not met because there is no evidence claimant has significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the "paragraph B" mental functioning criteria that are identical to the "paragraph B" criteria discussed above. Finally, there is no evidence about the claimant's current intellectual and adaptive functioning and about the history of the claimant's disorder demonstrating or supporting the conclusion that the disorder began prior to the claimant's attainment of age 22.

(ECF Doc. No. 14, PageID # 105).

### D.    Esper's Arguments

Esper asserts that the ALJ's Step Two and Step Three conclusions are not supported by substantial evidence because the ALJ failed to properly evaluate and summarize evidence of Esper's significant cognitive and intellectual impairments. (ECF Doc. No. 16, PageID # 1303). Esper asserts several related sub-arguments in support of his position, including: (1) the ALJ erred by determining that the record was void of evidence of deficits in adaptive functioning (*id.*); (2) the ALJ erred by determining that Esper's intellectual disability did not satisfy the requirements of Listing 12.05 (*id.*); (3) the ALJ's determination that Esper had moderate limitations in all four areas of adaptive functioning (*i.e.*, understanding, remembering, and applying information; interacting with others; concentrating, persisting, or maintain pace; and adapting or managing oneself) was based on the ALJ's determination that the record lacked evidence to the contrary, which is wholly inaccurate (*id.* at PageID # 1304-09); (4) the record contains uncontroverted evidence of full-scale IQ scores below 70, both before and after Esper attained age twenty-two (*id.* at PageID # 1308); (5) Esper's GAF scores over time constitute longitudinal evidence of deficits in adaptive functioning (*id.* at PageID # 1309); (6) the ALJ failed to adequately explain the apparent discrepancies between Dr. Watkins's findings of extreme limitations and the rest of his narrative report (*id.* at PageID # 1309-10); and (7) the ALJ "cherry-picked" evidence to support

her conclusions while ignoring contrary evidence (*id.* at PageID # 1310).

### E. Analysis

Despite Esper's arguments to the contrary, the ALJ's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Winn*, 615 F. App. at 320 (6th Cir. 2015) (quoting *Cole*, 661 F.3d at 937 (6th Cir. 2011)). As previously noted, the ALJ determined that Esper did not satisfy the Paragraph B criteria, in part, because Esper's "mental impairments do not cause at least two 'marked' limitations or one 'extreme' limitation" in adaptive functioning. (ECF Doc. No. 14, PageID # 103). In reaching this conclusion, the ALJ evaluated the evidence – including Esper's own statements and testimony, the medical and educational records, and Dr. Watkins's report – compared the evidence to the requirements of Listing 12.05, and provided an explained conclusion, which the undersigned outlined above. (*Id.* at PageID # 101-03, 10); *see Reynolds v. Comm'r of Soc. Sec.*, 424 F. App. 411, 416 (6th Cir. 2011).

While Esper asserts that the ALJ did not adequately explain her reasoning for finding Dr. Watkins's report not fully persuasive, his argument lacks merit because the ALJ explained that she found some of Dr. Watkins's findings inconsistent with the narrative portion of his report, and such inconsistencies are readily apparent. (*See* ECF Doc. No. 14, PageID # 112). For example, the ALJ noted that the narrative portion of Dr. Watkins's report indicated that he expected Esper to have relatively little difficulty with simple, concrete instructions. (*Id.*). Yet Dr. Watkins went on to opine that Esper has moderate limitations in his ability to carry out simple instructions. (ECF Doc. No. 14, Exhibit 10F, PageID # 1195). Additionally, while Esper asserts that the IQ test results in the record "raise[] a substantial questions with respect to prongs 1 and 3" of Listing 12.05(B), the ALJ acknowledged that Esper's IQ scores satisfied this criteria, but concluded that "the record does not include evidence of deficits of adaptive functioning – a requisite element to meet or equal the listing section." (ECF Doc. No. 14, PageID # 102).

In support of Esper's argument that the record contains evidence of marked and/or extreme limitations in his adaptive functioning, Esper points to his IQ scores, his educational background, his testimony, Dr. Watkins's report, his GAF scores, and the medical records demonstrating his history with drug abuse and his intellectual disability. Esper acknowledges that the ALJ considered some of this evidence, but he argues that – when viewing the record as a whole – the record does not support the ALJ's conclusions. (ECF Doc. No. 16, PageID # 1303, 1308).

While the record certainly documents Esper's intellectual limitations, the record – including those portions summarized in this Report and Recommendation – substantially supports the ALJ's conclusion that Esper did not satisfy the adaptive-functioning requirements of Listing 12.05(B). The evidence Esper cites in support of his argument, when considered relative to the entire record, does not establish that he reasonably could meet or equal the requirements of Listing 12.05(B). *See Smith-Johnson*, 579 F. App. 426, 432 (6th Cir. 2014).

Moreover, Esper's assertion that the ALJ simply "cherry-picked" evidence to support her conclusions lacks merit. "The problem with a cherry-picking argument is that it runs both ways. [Esper] argues the ALJ only focused on the positives, whereas his brief emphasizes the negatives. Crediting [Esper's] argument here would require the Court to re-weigh evidence – which it cannot not do." *Colvin v. Comm'r of Soc. Sec.*, No. 5:18 CV 1249, 2019 WL 3741020, at *14 (N.D. Ohio May 8, 2019), *report and recommendation adopted*, No. 4:18CV1249-JRA, 2019 WL 4743624 (N.D. Ohio Sept. 30, 2019). Instead, to be successful, Esper must show that the ALJ's decision is not supported by substantial evidence. "[A] claimant does not establish a lack of substantial evidence by pointing to evidence of record that supports h[is] position. Rather, [the claimant] must demonstrate that there is not sufficient evidence in the record that would allow a reasoning mind to accept the ALJ's conclusion." *Greene v. Astrue*, No. 1:10-cv-0414, 2010 WL 5021033, at *4 (N.D. Ohio Dec. 3, 2010). Esper has not done so.

Having reviewed the ALJ's decision, the record, and the arguments presented, the undersigned concludes that the Court should uphold the ALJ's decision.

## VI.      RECOMMENDATION

Based on the foregoing, the undersigned RECOMMENDS that the Court OVERRULE Esper's assignment of error and AFFIRM the ALJ's decision.


Dated: 12/5/2022                                    s/*Jennifer Dowdell Armstrong*
                                                     Jennifer Dowdell Armstrong
                                                     U.S. Magistrate Judge


## VII.     NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

**Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and

recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).